## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MACK L. KERN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00079 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Mack L. Kern, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kern protectively filed his applications for DIB and SSI on March 19, 2007, alleging disability as of March 19, 2007,[1] due to degenerative disc disease, severe nerve damage and musculoskeletal problems, severe headaches, numbness in the arms and hands, pain in the arms and legs, insomnia and a foot disorder. (Record, ("R."), at 72-74, 80-81, 87, 91.) The claims were denied initially and on reconsideration. (R. at 40-42, 47-48, 49, 352-54, 359-60.) Kern then requested a hearing before an administrative law judge, ("ALJ"). (R. at 49.) A hearing was held on July 1, 2008, at which Kern was represented by counsel. (R. at 372-76.) However, the ALJ adjourned the hearing for Kern to obtain a consultative psychological evaluation, as well as a consultative neurological evaluation. (R. at 375.) Another hearing was held on January 7, 2009, at which Kern was again represented by counsel. (R. at 377-91.)

By decision dated January 30, 2009, the ALJ denied Kern's claims. (R. at 18-26.) The ALJ found that Kern meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 20.) The ALJ also found that Kern had not engaged in substantial gainful activity since

---

[1] Kern amended his alleged onset date from April 11, 2007, to March 19, 2007. (R. at 80.)

the alleged onset date.[2] (R. at 20.) The ALJ determined that the medical evidence established that Kern had severe impairments, namely degenerative disc disease of the cervical and lumbar spine and possible bilateral carpal tunnel syndrome, but he found that Kern's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-23.) The ALJ also found that Kern had the residual functional capacity to perform less than the full range of medium work.[3] (R. at 23-24.) Specifically, the ALJ found that Kern could lift and/or carry items weighing up to 40 pounds occasionally and up to 20 pounds frequently, occasionally bend, stoop and crouch and occasionally reach overhead, but that he could not climb ladders, work at heights or around hazardous machinery or equipment due to possible medication side-effects. (R. at 23.) The ALJ imposed no limitations on Kern's abilities to stand or walk. (R. at 23.) Therefore, the ALJ found that Kern was unable to perform his past relevant work. (R. at 24-25.) Given Kern's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that he could perform, including jobs as a hand packager, a sorter, an assembler, an inspector, a cleaner, a food service worker and a stock clerk. (R. at 25.) Thus, the ALJ found that Kern was not under a disability as defined under the Act and was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued his decision, Kern pursued his administrative appeals,

---

[2] The ALJ incorrectly noted the alleged onset date to be April 11, 2007. However, as stated previously, this date was amended to March 19, 2007. (R. at 80.)

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

-3-

(R. at 14), but the Appeals Council denied his request for review. (R. at 7-10A.) Kern then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Kern's motion for summary judgment filed March 30, 2011, and the Commissioner's motion for summary judgment filed April 29, 2011.

## II. Facts[4]

Kern was born in 1967, (R. at 72), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and past relevant work experience as a masonry laborer, a carpenter, a laborer at a metal/recycling business and a construction laborer. (R. at 99.) Dr. Susan M. Bland, M.D., a medical expert, testified regarding Kern's physical impairments at the January 7, 2009, hearing. (R. at 379-83, 384-87.) She testified that a March 2004 MRI and CT myelogram of the cervical spine showed severe disc problems at the C5-6 level of the spine, for which Kern underwent a cervical fusion in June 2004. (R. at 380.) Dr. Bland also stated that following this surgery, Kern did not have any evidence of severe radiculopathy, despite evidence of nerve root compression on imaging studies. (R. at 380.) Dr. Bland noted that a follow-up MRI of the cervical spine in December 2005 showed disc diffusion at the C6-7 level which had been seen previously, but there was no neural compromise. (R. at 380.) Dr. Bland testified that a CT myelogram in July 2006 showed that Kern had a good result from the surgery with complete fusion at the level that was treated.

---

[4] In large part, only those medical records pertinent to the court's determination as to whether substantial evidence supports the ALJ's decision are included in this Report and Recommendation. To the extent that any other records are discussed, it is for clarity of the record only.

(R. at 380.)  Changes in the cervical spine were again seen, but Kern did not have any nerve or spinal cord compromise.  (R. at 380.)  Dr. Bland further stated that Kern underwent a nerve conduction study at that time, which was normal.  (R. at 380.)  She noted that a neurosurgeon concluded that there was no need for surgery at that time.  (R. at 380.)  Dr. Bland noted a consultative examination in September 2008, at which time Kern had a reduced range of motion of the neck, but normal strength, sensation and reflexes, and there was no evidence of radiculopathy.  (R. at 380.)

With respect to Kern's lumbar spine impairment, Dr. Bland noted that he underwent imaging studies in March 2004, which showed a disc protrusion and a left L5 nerve with compression. (R. at 380-81.) However, no surgery was recommended, as Kern had no evidence of a severe radiculopathy at that time. (R. at 381.)  Kern also had normal strength and reflexes in the lower extremities. (R. at 381.)  In May 2006, imaging studies showed "pretty much the same findings as previously."  (R. at 381.)  A CT myelogram in July 2006 showed mild L5 nerve root compression bilaterally, but the neurosurgeon concluded that lower back surgery was not necessary.  (R. at 381.)  In September 2006, Kern's examination was "pretty normal," except he had a very slightly reduced strain in the quadriceps on the right.  (R. at 381.)  In August 2007, Kern's primary care physician thought that his pain was out of proportion with the objective findings, so he underwent an MRI of the thoracic spine in December 2007, which showed some degenerative disc disease, but no cord compression or nerve root compression.  (R. at 381.)  Kern also underwent another lumbar MRI at that time, which showed no change in the L4-5 disc protrusion, but the examination was not adequate to assess nerve root compression. (R. at 381.) Kern underwent a consultative examination in September

2008 by Dr. Jeffrey Uzzle, M.D., which showed a normal gait, normal strength, reflexes and sensation in all extremities, no atrophy, negative straight leg raise testing, normal back flexion and the ability to squat and hop on his leg. (R. at 381-82.)

With regard to Kern's back impairments, Dr. Bland concluded that, although there were some mild findings on imaging studies, there was no clinical evidence of radiculopathy or any kind of neural compromise. (R. at 382.) With respect to the issue of carpal tunnel syndrome, Dr. Bland noted that Kern underwent a nerve conduction study in May 2004 that showed bilateral or median nerve abnormality, sensory only. (R. at 382.) However, she noted that Kern had never clinically been diagnosed with carpal tunnel syndrome. (R. at 382.) Dr. Bland further noted that one examiner thought Kern had a positive Tinel's sign bilaterally, but she noted that he did not see an orthopedist for this problem. (R. at 382.) Dr. Bland further noted that Kern had complained at times of numbness in the right hand, especially with driving or with certain work activities. (R. at 382.) On a routine examination in 2005, Kern had some decreased sensation in both hands, which did not fit any particular pattern, and his strength was normal at that time. (R. at 382.) In July 2006, Kern underwent another nerve conduction study, which again was normal. (R. at 382.) In September 2008 when Kern saw Dr. Uzzle, another nerve conduction study of the median nerve also was normal. (R. at 382.) Strength, reflexes and sensation were normal at that time. (R. at 382.) Dr. Bland concluded that whatever abnormality on the nerve conduction study in May 2004 was not found on repeat exams in 2006 and 2008. (R. at 382.) She noted further that, clinically, Kern did not show evidence of carpal tunnel syndrome at the time of his consultative exam in 2008. (R. at 382.)

All of that being said, Dr. Bland opined that Kern would have some limitations, based mainly on his cervical spine, but somewhat on his lumbosacral degenerative disc disease without neuro compromise. (R. at 382-83.) She opined that Kern could lift items weighing up to 40 pounds occasionally and up to 20 pounds frequently, that he could occasionally bend, stoop and crouch, that he could occasionally reach overhead and that he could not climb ladders or work around heights or hazardous equipment. (R. at 383.)

Thomas W. Schacht, Psy.D., a psychiatric expert, also testified at Kern's hearing. (R. at 383-84.) Schacht testified that Kern's school records suggested slightly borderline verbal abilities with average abilities in the mechanical/spatial area. (R. at 384.) Schacht further noted very limited reference to treatment for depression in the primary care records, but which indicated that he responded well to treatment. (R. at 384.) He did not discuss the findings of Latham, the consultative psychological examiner.

Donna Bardsley, a vocational expert, also was present and testified at Kern's hearing. (R. at 388-90.) Bardsley testified that a hypothetical individual of the same age, education and work background as Kern, who also was limited as set out by Dr. Bland and who did not have any significant mental impairment that could not be controlled by medication, could not perform any of Kern's past work. (R. at 389.) Bardsley testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a hand packager, a sorter, an assembler, an inspector, a cleaner, some food service-related jobs and a stock clerk. (R. at 389.) Bardsley testified that the same individual, but who was precluded from work due to pain 15 percent of the time, could not

-7-

perform any jobs. (R. at 389.) Bardsley testified that the absentee rate for the enumerated jobs was one day monthly and that they allowed for a 15-minute break in the morning and in the afternoon, as well as a 30-minute lunch break. (R. at 390.) She testified that anything in excess of this would preclude employment. (R. at 390.) Bardsley testified that these jobs would not allow an individual to sit, stand and move around the workstation. (R. at 390.) Lastly, Bardsley testified that an individual with the limitations set out by Dr. Bland, but who also was moderately impaired in the ability to interact appropriately with supervisors, co-workers and the general public, and who was markedly impaired in the ability to respond appropriately to usual work situations and routine changes in the work environment, could not perform any jobs. (R. at 389-90.)

In rendering his decision, the ALJ reviewed records from Holston Valley Medical Center; Paul B. Schodowski, D.P.M.; Clinch River Health Services; Holston Medical Group; Indian Path Medical Center; Blue Ridge Neuroscience Center, P.C.; Dr. Michael Hartman, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Thomas Phillips, M.D., a state agency physician; ETSU Family Physicians of Kingsport; The Regional Eye Center; Scott County Schools; Edward E. Latham, Ph.D., a clinical psychologist; and Dr. Jeffrey Uzzle, M.D. Although Kern's counsel submitted additional medical records from Scott County Behavioral Health Center to the Appeals Council, the Appeals Council declined to consider them because they post-dated the ALJ's decision date and were not related to the pertinent time period for determining disability. (R. at 8.)

Kern underwent an anterior cervical disckectomy and fusion with banked

-8-

allograft and anterior plating on June 11, 2004, by Dr. Paul Peterson, M.D., to correct a herniated nucleus pulposus at the C5-6 level of the cervical spine with right arm C6 radiculopathy. (R. at 159-60.) Kern was discharged the following day in satisfactory condition. (R. at 159.) A December 12, 2005, follow-up MRI of the cervical spine showed postoperative changes without residual abnormality at the C5-6 level of the spine and an unchanged protrusion/osteophyte on the left at the C6-7 level. (R. at 193.) This MRI was otherwise normal. (R. at 193.)

After involvement in a motor vehicle accident, x-rays of the cervical spine dated April 5, 2006, were normal, and x-rays of the lumbar spine showed degenerative disc disease at the L4-5 level with mild degenerative spurring throughout. (R. at 200-01.) A July 10, 2006, CT myelogram of the cervical spine showed postoperative ACDF at the C5-6 level with mild disc degeneration at the C3-4 and C6-7 levels with no acute disc herniation or evidence of central canal stenosis. (R. at 204-05, 213-14.) A CT myelogram of the lumbar spine performed the same day showed disc degeneration and a small broad-based disc protrusion at the L4-5 level. (R. at 205, 212.)

Following a physical examination and review of these imaging studies, on August 9, 2006, Dr. Rebekah C. Austin, M.D., a neurosurgeon, diagnosed Kern with postoperative large right C5-6 cervical herniated nucleus pulposus without myelopathy; cervical postoperative stenosis at the C5-6 level without myelopathy, clinically improved; worsening neck pain; intermittent bilateral hand numbness; worsening low back pain; unspecified occipital headache, failing to improve; lumbar degenerative disc disease at the L4-5 level; and a small broad-based lumbar herniated nucleus pulposus at the L4-5 level with no clearcut radiculopathy. (R. at

-9-

205.)  Dr. Austin opined that surgical intervention was not necessary, and she recommended continued conservative treatment.  (R. at 205.)  She opined that Kern could not return to work at that time, relinquishing any further work issues to Kern's primary care physician.  (R. at 205.)  No follow-up was scheduled.  (R. at 205.)

Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on September 8, 2006, finding that Kern could perform light work[5] with a limitation in the ability to push/pull with the upper extremities and in the ability to reach.  (R. at 234-39.)  Dr. Hartman further found that Kern could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds.  (R. at 236.)

Dr. Richard Surrusco, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment of Kern on June 5, 2007, finding that Kern could perform light work with a limited ability to push and/or pull with all extremities.  (R. at 241-47.)  Dr. Surrusco found that Kern could never climb, but could occasionally balance, stoop, kneel, crouch and crawl.  (R. at 243.)  He further found that Kern could occasionally reach in all directions, including overhead, with both shoulders and that he should avoid even moderate exposure to hazards, such as machinery and heights.  (R. at 243-44.)

Dr. Thomas Phillips, M.D., another state agency physician, completed a

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If a person can perform light work, he also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

-10-

Physical Residual Functional Capacity Assessment on October 30, 2007, which mirrored Dr. Surrusco's findings. (R. at 252-58.)

Kern was seen at ETSU Family Physicians of Kingsport from January 26, 2007, through September 25, 2007. (R. at 260-65, 268-73.) Over this time, Kern was treated for complaints of neck pain, back pain and headaches. In January 2007, Kern had a decreased range of motion of the back, and he reported situational stress. (R. at 264.) He was diagnosed with chronic neck and back pain, and he was prescribed Percocet. (R. at 265.) On February 23, 2007, Kern again had decreased range of motion of the back, but he reported that Percocet helped his back pain. (R. at 262.) He was diagnosed with stable back pain. (R. at 263.) By April 23, 2007, Kern reported nonradiating upper back pain, which he rated as a nine on a 10-point scale, noting that Percocet helped only for a few hours. (R. at 260.) He exhibited tenderness at the C5-7 levels of the spine and decreased range of motion with flexion and extension. (R. at 260.) Kern had 2+ deep tendon reflexes and decreased sensation of the right upper extremity. (R. at 260.) He was diagnosed with back pain and was prescribed MSContin in addition to the Percocet. (R. at 261.) It was noted on August 9, 2007, that Kern's pain appeared to be out of proportion with the objective evidence and that he was using frequent short-acting treatment in spite of the availability of long-acting treatment. (R. at 271.) By September 25, 2007, Kern reported an ability to perform daily activities with Percocet. (R. at 268.) His back examination was the same as in April 2007. (R. at 268.) Kern also reported panic and situational stress. (R. at 268.) He was diagnosed with back pain secondary to lumbar degenerative disc disease and cervical stenosis. (R. at 269.) He was continued on Percocet. (R. at 269.)

-11-

An MRI of the thoracic spine, taken on December 26, 2007, showed shallow disc protrusions in the lower thoracic region with no evidence of significant stenosis or focal nerve root compression. (R. at 286-87.) An MRI of the lumbar spine the same day showed a disc bulge at the L4-5 level, unchanged from previous studies, no significant stenosis centrally, but narrowed lateral recesses and mild L5 nerve root compression could not be excluded. (R. at 287-88.) This MRI further showed disc degeneration at the L2-3 level, unchanged from previous studies, with the spinal canal widely patent at that level. (R. at 288.) There also was developmental narrowing of the lumbar spinal canal, but no acute appearing abnormality was identified. (R. at 288.)

Edward E. Latham, Ph.D., a clinical psychologist, completed a consultative psychological evaluation of Kern on July 28, 2008, at the request of the ALJ. (R. at 329-32.) Kern reported that his teachers simply "passed [him] from grade to grade to get him out of class and school." (R. at 329.) He was alert and adequately oriented with no signs of pathologic disturbance in thought processes or content. (R. at 330.) His mood was depressed, and his affect varied appropriately with his thought content. (R. at 330.) Kern persevered when given challenging tasks. (R. at 330.) His graphomotor skills were not significantly impaired, and speech was intelligible and adequate in rate, volume and articulation. (R. at 330.) Kern reported concentration problems and short-term memory deficits. (R. at 330.) He denied any suicidal thoughts. (R. at 330.) Kern stated that he did not like being around a lot of people and avoided shopping, but he denied severe panic episodes. (R. at 330.)

Latham administered the Wechsler Adult Intelligence Scale-Third Edition,

("WAIS-III"), on which Kern obtained a verbal IQ score of 85, a performance IQ score of 77 and a full-scale IQ score of 79, placing him in the low average to borderline deficient range of development. (R. at 330-32.) The Wide-Range Achievement Test-Third Edition, ("WRAT-3"), also was administered and showed that Kern's reading and writing skills were deficient, and his mathematical skills were borderline deficient. (R. at 331.) Latham also administered the Personality Assessment Inventory, ("PAI"), the results of which were considered invalid, but which was not interpreted as an effort toward faking bad. (R. at 331.) Instead, Latham opined that the invalidity was likely due to Kern attempting to present an overly negative picture in order to gain help. (R. at 331.)

Latham concluded that Kern was borderline deficient to low average in overall intellect. (R. at 331.) He further concluded that Kern showed evidence of having a significant emotional disturbance, despite no clear pattern of dysfunctional personality patterns. (R. at 331.) Latham diagnosed moderate major depression, single episode. (R. at 331.) He opined that Kern could understand, retain and follow simple instructions and perform routine, repetitive tasks. (R. at 331.) Attention and concentration skills were deemed sufficient for simple tasks. (R. at 331.) Kern's ability to relate interpersonally appeared to be moderately impaired, and his ability to handle everyday stressors appeared to be moderately to markedly impaired. (R. at 331.)

The same day, Latham also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding that Kern was mildly limited in his abilities to understand, remember and carry out complex instructions and moderately limited in his abilities to interact appropriately with the public,

-13-

with supervisors and with co-workers. (R. at 333-35.) Latham further found that Kern was markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 334.)

On September 17, 20089, Kern saw Dr. Jeffrey Uzzle, M.D., for a consultative neurological examination and bilateral upper extremity nerve conduction study at the ALJ's request. (R. at 336-42.) Kern reported chronic headaches, neck pain, back pain, right upper extremity radiculopathy and left lower extremity radiculopathy. (R. at 336-37.) Physical examination showed normal gait and station, as well as toe-walking and heel-walking. (R. at 337.) Kern also could do a deep knee bend normally, and finger-to-nose and heel-to-shin testing was normal bilaterally. (R. at 337-38.) Tandem walking was normal, Romberg test was negative, and pronator drift was negative. (R. at 338.) Muscle tone was normal in all extremities, as were strength, reflex and sensory testing. (R. at 338.) Hoffmann's sign was negative, as was clonus and Babinski's sign bilaterally. (R. at 338.) Sitting straight leg raise testing and supine straight leg raise testing on the left was negative, but sitting and supine straight leg raise testing on the right caused lower back pain without lower extremity radiculopathy. (R. at 338.) Kern had increased lower back pain with lumbar extension, but he had full flexion, bilateral side bending and rotation of the lumbar spine without complaints. (R. at 338.) Cervical range of motion was normal in flexion and bilateral side bending, but pain limited extension and bilateral rotation. (R. at 338.) Dr. Uzzle diagnosed chronic lower back pain and right lower extremity radicular pain. (R. at 338.) He also noted congenital stenosis of the lumbar spine. (R. at 338.)

Dr. Uzzle completed a Medical Source Statement Of Ability To Do Work-

-14-

Related Activities (Physical) the same day, finding that Kern could continuously lift and carry items weighing up to 10 pounds, frequently lift and carry items weighing up to 20 pounds and occasionally lift and carry items weighing up to 50 pounds.  (R. at 343-48.)  He further found that Kern could sit, stand and/or walk for a total of up to four hours in an eight-hour workday and for two hours without interruption.  (R. at 344.) Dr. Uzzle opined that Kern could use the left hand to continuously reach, handle, finger, feel and push/pull objects, that he could continuously use the right hand to reach, but that he could frequently use the right hand to handle, finger, feel and push/pull objects. (R. at 345.)  Dr. Uzzle found that Kern could use the left foot continuously for the operation of foot controls, but could use the right foot frequently. (R. at 345.) He found that Kern could occasionally climb ladders or scaffolds, but he could frequently climb stairs and ramps, balance, stoop, kneel, crouch and crawl. (R. at 346.) He found that Kern could occasionally work at unprotected heights, around moving mechanical parts, that he could occasionally operate a motor vehicle and that he could occasionally work around vibrations.  (R. at 347.) Dr. Uzzle found that Kern could frequently work around loud noise, and he could continuously work around humidity and wetness, dust, odors, fumes and pulmonary irritants and temperature extremes.  (R. at 347.) Dr. Uzzle opined that these limitations had existed since Kern's 2004 neck surgery.  (R. at 348.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).

-15-

This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Kern argues that the ALJ erred by failing to find that he had a severe mental impairment and no work-related mental limitations whatsoever. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief" at 9-12.) More specifically, Kern argues that the ALJ erred by rejecting Latham's opinion and, in doing so, substituted his own opinion for that of a psychological expert. (Plaintiff's Brief at 12.) Kern further argues that the ALJ's physical residual functional capacity finding is not supported by substantial evidence, as he rejected,

-16-

without explanation, the opinions of the state agency physicians, as well as the opinion of Dr. Uzzle, the consultative neurological examiner. (Plaintiff's Brief at 12-16.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Kern first argues that the ALJ erred by failing to find that he had a severe mental impairment. (Plaintiff's Brief at 9-12.) I agree. At the first hearing in July

-17-

2008, the ALJ stated that he would send Kern for a consultative psychiatric evaluation, apparently due to the lack of psychiatric treatment records. Kern saw psychologist Latham in July 2008. After administering the WAIS-III, the WRAT-3 and the PAI, Latham diagnosed Kern with major depression, moderate, single episode. (R. at 331.) He concluded that Kern was mildly limited in his abilities to understand, remember and carry out complex instructions and moderately limited in his abilities to interact appropriately with the public, with supervisors and with co-workers. (R. at 333-35.) Latham further found that Kern was markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 334.) In his decision, the ALJ stated that Latham's findings were of "no probative value" because they were based primarily on Kern's subjective allegations rather than on objective findings. (R. at 23.) I find that this simply is not the case. As noted above, Latham administered three separate objective tests to Kern. The results of the WAIS-III showed that Kern's intellect was low average to borderline deficient. (R. at 330-31.) The results of the WRAT-3 showed that Kern's reading skills and writing skills were deficient, and his math skills were borderline deficient. (R. at 331.) Finally, the results of the PAI were deemed to be invalid because Latham suspected that Kern was attempting to present an overly negative picture in order to gain help. (R. at 331.) Latham specifically stated, however, that he did not believe Kern was faking bad. (R. at 331.)

After deeming Latham's findings of "no probative value," the ALJ proceeded with a rather lengthy analysis of whether Kern's mental impairment was severe. Specifically, he analyzed Kern's mental impairment under the "four broad functional areas set out in the disability regulations for evaluating mental

-18-

disorders." (R. at 22.) The ALJ concluded that Kern had no functional limitation in performing activities of daily living, mild limitations in social functioning, mild limitations in concentration, persistence or pace and had experienced no episodes of decompensation of extended duration. (R. at 22.) In arriving at these conclusions, the ALJ relied on Kern's lack of special education, his graduation from high school with a regular diploma, his performance of semiskilled work in the relevant past, Schacht's testimony that the limited evidence regarding Kern's mental impairment showed good response to treatment, that no treating source had indicated that Kern had significant anxiety or depression, that mental status examinations did not show significant abnormalities, that Kern had not sought professional mental health treatment and that he was not prescribed psychiatric medication. (R. at 23.) I note that Schacht did not address the findings of Latham despite the fact that the ALJ had specifically ordered this consultative examination. Finally, the ALJ noted that Kern's credibility was diminished by evidence of past marijuana use. (R. at 23.)

It is well-settled that "[i]n the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). As Latham's opinions are the only ones from a mental health professional contained in the record,[6] when the ALJ rejected it in whole, instead

_____

[6] Although Kern would like this court to consider the treatment records from Scott County Behavioral Health Center, because the Appeals Council declined to consider them in reaching its decision not to grant review, the only instance in which they may be considered by

undertaking himself the analysis of the severity of Kern's mental impairment, he, in essence, substituted his own opinion for that of a trained mental health professional, which he cannot do. It is for these reasons, I find that substantial evidence does not support the ALJ's finding that Kern does not suffer from a severe mental impairment, and I recommend that the case be remanded to the ALJ for further consideration of this issue.

Kern also argues that the ALJ erred in his physical residual functional capacity finding because he rejected, without explanation, the opinions of the state agency physicians and Dr. Uzzle. (Plaintiff's Brief at 12-16.) I also find this argument persuasive. The ALJ concluded that Kern retained the functional capacity to lift items weighing up to 40 pounds occasionally and up to 20 pounds frequently, that he could occasionally bend, stoop and crouch, that he could occasionally reach overhead and that he could not climb ladders or work around heights or hazardous equipment. (R. at 23.) Given these findings, it is apparent that the ALJ adopted the opinion of Dr. Bland, the medical expert.

On June 5, 2007, and again on October 30, 2007, state agency physicians Dr. Surrusco and Dr. Phillips, respectively, concluded that Kern could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently, that he was limited in his ability to push and/or pull with all extremities, that he could never climb, that he could occasionally balance, stoop, kneel, crouch and crawl,

---

this court is if they are new and material, relating to the relevant time period for determining disability. *See Wilkins*, 953 F.2d at 95-96; 20 C.F.R. §§ 404.970(b), 416.1470(b) (2011). I find that, while the evidence is new, it is not material because it is not related to the relevant time period, as it post-dates the ALJ's decision, and there is nothing contained in the records relating the findings contained therein to the relevant period before this court.

-20-

that he could occasionally reach in all directions, including overhead, and that he must avoid even moderate exposure to hazards, such as machinery and heights. (R. at 241-47, 252-58.)

After performing a physical examination of Kern on September 17, 2008, Dr. Uzzle opined that Kern could lift and/or carry items weighing up to 10 pounds continuously, up to 20 pounds frequently and up to 50 pounds occasionally. (R. at 343.) He further found that Kern could sit, stand and/or walk for a total of four hours in an eight-hour workday, but for up to two hours without interruption. (R. at 344.) Dr. Uzzle found that Kern could climb ladders and scaffolds, work at unprotected heights and around moving mechanical parts, operate a motor vehicle and work around vibrations, all on an occasional basis. (R. at 346-47.)

Kern argues that the ALJ erred by failing to mention the opinions of the state agency physicians and in failing to explain his apparent rejection thereof. (Plaintiff's Brief at 13.) Kern further argues that the ALJ erred by failing to explain his apparent rejection of the physical limitations noted by Dr. Uzzle. (Plaintiff's Brief at 14.) The Commissioner argues that because the ALJ properly credited the testimony of Dr. Bland in reaching his residual functional capacity finding, and because Dr. Bland considered the opinions of the state agency physicians and of Dr. Uzzle, there is no merit to Kern's argument that the ALJ erred by not explaining his rejection of these opinions. I agree only with respect to the opinions of Dr. Uzzle.

While it is true that the ALJ did not explicitly discuss Dr. Uzzle's findings in his decision, Dr. Bland, the medical expert, testified extensively regarding the

medical records pertinent to Kern's physical impairments before reaching her own physical residual functional capacity finding. She explicitly noted the consultative examination by Dr. Uzzle, specifically noting that Kern exhibited a reduced range of motion of the neck, but had normal strength, sensation and reflexes and no radiculopathy. (R. at 380.) Dr. Bland also noted, with regard to Kern's lumbar impairment, that Dr. Uzzle found a normal gait, the ability to squat and hop on the leg, normal strength, reflexes and sensation in all four extremities, no atrophy, negative straight leg raise testing and normal back flexion. (R. at 381-82.) Dr. Bland emphasized that there was no clinical evidence of radiculopathy or any kind of neurological compromise. (R. at 382.) The ALJ adopted Dr. Bland's findings in reaching his conclusion regarding Kern's physical residual functional capacity. Thus, I find Kern's argument that the ALJ ignored Dr. Uzzle's opinions unpersuasive. However, I cannot find the same with respect to the opinions of the state agency physicians. Although the ALJ briefly discussed the state agency physicians' findings in his decision, he mischaracterized them as consistent with his own physical residual functional capacity finding. (R. at 24.) That being said, of course the ALJ did not explain any rejection thereof because he did not reject them. Instead, I suppose, he accepted them improperly on the mistaken ground that they were consistent with his findings. It is for this reason that I must find that substantial evidence does not support the ALJ's physical residual functional capacity finding because it is not based on a proper analysis of all the evidence of record.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence does not exist to support the Commissioner's rejection of Latham's opinions regarding Kern's mental impairment;

2.  Substantial evidence does not exist to support the Commissioner's mental residual functional capacity finding;

3.  Substantial evidence does not exist to support the Commissioner's weighing of the evidence regarding Kern's physical impairments;

4.  Substantial evidence does not exist to support the Commissioner's physical residual functional capacity finding; and

5.  Substantial evidence does not exist to support the Commissioner's finding that Kern was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Kern's and the Commissioner's motions for summary judgment, vacate the ALJ's decision denying benefits and remand the case to the ALJ for further consideration consistent with this Report and Recommendation.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     November 14, 2011.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-24-